UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **LICAIRA FELIZ,** *Plaintiff* : : : | |
| **V.** : : | **C.A. NO.:** **Jury Trial Demanded** |
| **ROBERT CORIO, INC, alias,** **DESIGNS INTERNATIONAL, INC.** **d/b/a ROBERT CORIO DESIGNS, alias,** **and ROBERT C. CORIO, alias,** *Defendants* : : : : : | |

# COMPLAINT

## I. Introduction

1. This is an action brought by Plaintiff, Licaira Feliz, against the Defendants, Robert Corio, Inc., alias, Designs International, Inc., d/b/a Robert Corio Designs, alias, and Robert C. Corio, alias, seeking compensatory and punitive damages, counsel fees, costs, and other equitable relief arising out of violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. ("Title VII"), the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws §28-5-1, *et seq*. ("FEPA"), and the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws §42-112-1, et seq. ("RICRA").

## II. Parties

2. Plaintiff Licaira Feliz ("Plaintiff") is a resident of the City of Providence, County of Providence, and State of Rhode Island, and at all times relevant to this action was an employee employed by Defendants in the State of Rhode Island.

3. Defendant Robert Corio, Inc., alias, is a domestic corporation duly organized and incorporated under the laws of the State of Rhode Island with a principal place of business located at 1263 Hartford Avenue, Johnston, RI 02919.

4. Defendant Designs International, Inc., d/b/a Robert Corio Designs, alias, is a domestic corporation duly organized and incorporated under the laws of the State of Rhode Island with a principal place of business located at 1263 Hartford Avenue, Johnston, RI 02919.

5. Defendants Robert Corio, Inc. and Designs International, Inc. have shared common ownership by Defendant Robert C. Corio, shared common manufacturing facilities, and other shared business activities all managed solely by Defendant Robert C. Corio at their common principal place of business located at 1263 Hartford Avenue, Johnston, RI 02919.

6. Defendant Robert C. Corio, alias ("Mr. Corio") is the sole owner, sole officer (President, Vice President, Treasurer and Secretary), and operating manager of Defendants Robert Corio, Inc. and Designs International, Inc.  At all relevant times, Mr. Corio had supervisory capacity of Plaintiff and was the direct perpetrator and decision-maker with respect to the allegations made herein.

7. In addition to sole officer status and sole ownership of both corporate Defendants, Mr. Corio alone exercises common managerial control and alone exercises common control of personnel management, including hiring, firing, compensation, and assignment decisions, of both corporate Defendants all relying on one common HR manager/coordinator, Denise J. Rotondo.

8. Thus, Corporate Defendants constitute an integrated enterprise and Plaintiff's integrated employers jointly and severally liable for all of Plaintiff's recoverable damages.

9. As used herein, the term "Defendants" refers to all three (3) Defendants collectively, unless otherwise indicated expressly or by context.

### III.   Jurisdiction

10. The United States District Court for the District of Rhode Island has federal subject matter jurisdiction over this case pursuant to the provisions of 28 U.S.C. §1331 because Plaintiff asserts claims arising under federal law; specifically, Title VII, 42 U.S.C. §2000e, *et*

*seq*. Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. §1367 as they arise out of the same case or controversy.

## IV.   Venue

11. Pursuant to the requirements set forth in 28 U.S.C. §1391, venue is proper in this Court insofar as Defendants are doing business in Rhode Island and therefore are deemed to reside in the District of Rhode Island.  Moreover, a substantial part of the acts and/or omissions giving rise to the claims asserted herein occurred in the District of Rhode Island.

## V.   Exhaustion of Administrative Remedies

12. On or about October 1, 2019, Plaintiff filed a Charge of Discrimination with the Rhode Island Commission for Human Rights ("RICHR") and the United States Equal Employment Opportunity Commission ("EEOC") against Defendants alleging gender, sex, and pregnancy discrimination.

13. Thereafter, and in accordance with R.I. Gen. laws §28-5-24.1(c), Plaintiff elected to terminate all proceedings before the RICHR and the EEOC and to have her case heard in Court.

14. On or about April 22, 2021 the RICHR issued Plaintiff a Notice of Right to Sue.

15. On or about June 30, 2021, Plaintiff requested a Notice of Right to Sue from the EEOC.

16. Accordingly, Plaintiff has timely and properly exhausted her administrative remedies and thereby satisfied all pre-conditions to bringing the within action.

## VI.   Material Facts

17. At all relevant times, Plaintiff was a member of a protected class because she is a woman and, at all times relevant to the discrimination claims asserted herein, Plaintiff was pregnant, and Defendants were aware of her pregnancy.

18. On February 5, 2018, Mr. Corio interviewed Plaintiff for a position with corporate Defendants and hired Plaintiff on the spot to wash jewels in Defendants' Ultra-Sonic/Washing Department.

19. Throughout Plaintiff's employment, she was always a top performer, her performance met or exceeded Defendants' legitimate expectations, and she was never subject to any criticism or discipline whatsoever.

*Inappropriate Gender/Sex Based Conduct in the Workplace*

20. Upon Ms. Plaintiff's hiring until or about October 2, 2018, Mr. Corio was unusually friendly, talkative, and flattering towards Plaintiff.

21. In fact, Mr. Corio regularly visited Plaintiff at her workstation, or would stop Plaintiff when she was walking in different parts of the factory, simply to chat with her even about matters unrelated to her employment.

22. Plaintiff initially assumed Mr. Corio was simply being nice to a new employee, however, she grew uncomfortable about her interaction with Mr. Corio once Plaintiff was informed by other employees in the Ultra-Sonic/Washing Department that Mr. Corio never previously visited the Department and that it was unusual that he now frequently visited only to chat with Plaintiff.

23. Mr. Corio's interaction with Plaintiff soon became increasingly uncomfortable and inappropriate.

24. For example, Mr. Corio would comment on Plaintiff's make-up, tell her that she looked "beautiful," and inquire why she was wearing make-up at work.

25. Moreover, on numerous occasions, Mr. Corio would direct Plaintiff to clean his office/work area, even though that was outside of Plaintiff's job duties, and would remain in the office while Plaintiff was cleaning to chat with her.

26. Mr. Corio's "chats" with Plaintiff made Plaintiff uncomfortable and became increasingly inappropriate.

27. For example, during one occasion when Plaintiff was called into Mr. Corio's office/work area to clean, Mr. Corio told Plaintiff that she was "intelligent and beautiful" and informed Plaintiff that he wanted her to "to be more at [the] company than just washing jewels."

28. Mr. Corio's sexualized comments combined with his implied offer to promote Plaintiff essentially amounted to unlawful *quid pro quo* conduct in the workplace.

29. On or about April of 2018, Mr. Corio called Plaintiff into his office and told her that he was increasing her hourly rate by 18% and directed her not to disclose her raise to anyone.

30. Notably, the pay raise was unsolicited and, on information and believe, highly unusual in the workplace.

31. On information and belief, the 18% pay raise was given in an effort by Mr. Corio to gain favor with Plaintiff.

32. Subsequently, Mr. Corio again called Plaintiff into his office where he told Plaintiff that she would be the only one in the Ultra-Sonic/Washing Department getting overtime hours and that he was not going to divide overtime hours up with anyone else.

33. Plaintiff felt uncomfortable with what felt like unsolicited "approaches" by Mr. Corio and did not engage much in the "chats" besides thanking Mr. Corio out of politeness.

34. Admittedly, although uncomfortable, Mr. Corio's actions also made Plaintiff feel like she had job security, which she was lucky to have under the circumstances.

*Pregnancy Disclosure and Discriminatory Treatment*

35. On October 2, 2018, Plaintiff disclosed to Defendants, by and through her supervisor, Alberto Navincopa, that she was pregnant.

36. On information and belief, either Mr. Navincopa or another of Defendants' employee informed Mr. Corio of Plaintiff's pregnancy.

37. In fact, at an unemployment hearing regarding Plaintiff's unemployment benefits, Mr. Corio provided sworn testimony that he was informed of Plaintiff's pregnancy on October 2, 2018.

38. After Plaintiff disclosed her pregnancy status on October 2, 2018, Mr. Corio suddenly stopped being very friendly with Plaintiff, stopped going out of his way to chat with Plaintiff, stopped visiting Plaintiff's workstation, stopped calling Plaintiff into his office, and stopped his positive remarks and flattery.

39. In early November 2018, Mr. Corio called Plaintiff into the design room for a conversation.

40. During that early November 2018 conversation, Mr. Corio asked "Are you pregnant" even though Mr. Corio already knew the answer.

41. Plaintiff politely answered "yes" and Mr. Corio responded. "That was a surprise for me, I thought you did not have a boyfriend."

42. Mr. Corio's comment made Plaintiff feel uncomfortable, offended, and flustered, especially his immediate reference to a "boyfriend."

43. During that same conversation, Mr. Corio then informed Plaintiff that she could not continue to work in the Ultra-Sonic/Washing Department room because "chemicals" could harm her baby.

44. Plaintiff was confused by Mr. Corio's comment regarding chemicals because to Plaintiff's knowledge and belief there were no "chemicals" in the Ultra-Sonic/Washing Department.

45. Moreover, at no point did Plaintiff discuss any concerns with "chemicals" in the workplace or request a transfer.

46. To Plaintiff's knowledge and belief, OSHA had inspected the factory through the summer and Mr. Corio implemented all OSHA improvements and Plaintiff was not aware of any changes to Ultra-Sonic/Washing Department.

47. None of Plaintiff's job duties ever required her to read warning instructions about any chemicals.

48. Plaintiff never smelled any chemicals, nor was Plaintiff ever bothered by any chemicals throughout her employment with Defendants.

49. Upon information and belief, there are no chemicals that created or posed any fetal hazard or threatened any harm to Plaintiff's pregnancy in the Ultra-Sonic/Washing Department.

50. Upon information and belief, Mr. Corio knew that there were no chemicals that created or posed any fetal hazard or threatened any harm in the Ultra-Sonic/Washing Department.

51. Upon information and belief, Mr. Corio's unilateral decision to transfer Plaintiff out of the Ultra-Sonic/Washing Department was mere pretext to transfer Plaintiff to another department with the ultimate goal of ending her employment once Mr. Corio found out that she was pregnant and was no longer interested in her romantically.

52. The pretextual nature of Plaintiff's transfer is supported by the fact that Plaintiff never asked to be reassigned due to chemicals, her pregnancy, or anything else and never requested any change in duration of breaks, hours, job duties, or any other accommodations for her pregnancy.

53. Additionally, both Mr. Corio and Mr. Navincopa were fully aware that Plaintiff did not have any impairment or limitation that prevented her from continuing to perform her working duties in the Ultra-Sonic/Washing Department or other assignments she was temporarily assigned to on occasion.

54. Moreover, the only time Plaintiff even inquired about chemicals in the workplace was *after* Mr. Corio brought up the fake assertion of "chemicals" in the workplace, and then she only inquired in order to research the basis for Mr. Corio's assertion and whether or not there were in fact chemicals in the workplace that could harm Plaintiff and/or her baby.

*Discriminatory Transfer*

55. Mr. Corio instructed Plaintiff to accompany him to speak with HR manager/coordinator, Denise Rotondo.

56. Mr. Corio told Ms. Rotondo to give Plaintiff a list of chemical products so that Plaintiff could discuss with her doctor.

57. Plaintiff never received such list, and, upon information and belief, Mr. Corio changed his mind and told Ms. Rotondo not to provide Plaintiff with such list.

58. Mr. Corio then stated to Plaintiff that instead he would research what position he could assign Plaintiff to that "will not harm you and your baby."

59. Subsequently, Mr. Corio and Mr. Navincopa informed Plaintiff that Defendants were moving Plaintiff into Defendants' Wax Department.

60. Mr. Corio told Mr. Alberto to take Plaintiff to the Wax Department and Mr. Alberto said, "You are going to work in the wax department during your pregnancy."

61. Initially, Plaintiff's transfer was still a full time forty (40) hours a week position at the same hourly rate.

62. However, Mr. Corio ordered Plaintiff to work in the Wax Department with full knowledge that Defendants were in the process of automating that position and that it was slow work or no work department, which Defendants admitted to in their Position Statement submitted to the RICHR.

63. Mr. Corio later alleged before the Department of Labor and Training and to the RICHR that Plaintiff was the one who requested reassignment, however, Mr. Corio ordered

Plaintiff's reassignment and Plaintiff never requested reassignment nor declined any jobs/positions within the Defendants' company.

*Additional Discriminatory Treatment*

64. Thereafter, Defendants, by and through Mr. Corio, continued to take adverse discriminatory actions against Plaintiff.

65. For example, toward the end of November 2018, Plaintiff asked Ms. Rotondo for an employment verification letter from Defendants to support the immigration application paperwork that Plaintiff was preparing for her mother.

66. Plaintiff was planning on bringing her mother to live with her and assist with caring for Plaintiff's baby because Plaintiff intended to continue working full time after she gave birth.

67. Upon information and belief, Defendants frequently provided other employees the same kind of employment verification letters in connection with their family immigration applications.

68. Ms. Rotondo forwarded Plaintiff's employment verification letter request Mr. Corio, who refused to allow Ms. Rotondo to provide Plaintiff with a letter.

69. Plaintiff then spoke to Mr. Corio personally and explained why she needed the letter and that the letter only confirms that she is an employee of the company and verifies Plaintiff's weekly pay, however Mr. Corio still refused to provide the letter.

70. At Plaintiff's DLT unemployment appeal hearing, Defendants submitted an exhibit wherein Defendants admitted that Ms. Corio did not want to provide the letter because he was already "thinking of cutting [Plaintiff's] hours."

*Pretextual Termination*

71. On or about Friday, December 7, 2018, Defendants, by and through Mr. Navincopa, suddenly informed Plaintiff that "there was no more work for [her]."

72. Plaintiff begged Mr. Navincopa to keep her working explaining that she could not survive financially without her job, but Mr. Navincopa offered no assistance.

73. Notably, Defendants had a few different positions where they needed assistance and could easily transition have transitioned Plaintiff into with minimal training, yet Defendants' failed and/or refused to do so.

74. Moreover, Defendants continued to hire new employees in direct contradiction to the claim that there was no more work available for Plaintiff.

75. Throughout that following weekend, Plaintiff was extremely emotionally distressed and knew that Defendants' actions toward her was clearly discrimination based on her pregnancy.

76. On Monday, December 10, 2018, Plaintiff reported to work at regular starting time, 7:30 am, and pleaded with Mr. Navincopa to let her keep her job.

77. Plaintiff also informed Mr. Navincopa that she would continue working until Defendants gave her a formal letter of dismissal.

78. Mr. Alberto told Plaintiff again that there was no work for her and told Plaintiff to contact the DLT, file for Temporary Disability Insurance (TDI) benefits, and inform the DLT that she was disabled.

79. Plaintiff refused and told Mr. Navincopa firmly and respectfully: "I cannot say I'm disabled because I am not sick, I am fine. I can work and the doctor is the one who would have to do so. She will not because it is not necessary. You know I need my job. Please give me work."

80. In response, Mr. Navincopa told Plaintiff to go home and that he would call her later.

81. Mr. Navincopa called Plaintiff later that afternoon and told her that Defendants would give her six (6) hours of work per week in three (3) hour shifts. Plaintiff texted Mr. Navincopa to get clarification on the hours and Mr. Navincopa sent a text stating "3 x 2 dias (days)."

82. Instead of transferring Plaintiff to a different department or offering her other work, Defendants decreased Plaintiff's hours, and compensation, by eighty-five percent (85%).

83. Upon information and belief, Defendants' drastic reduction of Plaintiff's hours, when Defendants had other work available and were aware of Plaintiff's need to work full time, was done in a discriminatory effort to get Plaintiff to quit her job.

84. However, Plaintiff did not quit her job.

85. Instead, on May 1, 2019, when Plaintiff was approximately eight (8) months pregnant, Defendants, by and through Mr. Corio, punitively and discriminatorily terminated Plaintiff's employment.

86. In a May 1, 2019 termination letter, Defendants informed Plaintiff that she was purportedly being terminated because "Robert Corio Design recently purchased new equipment to perform your current duties in the Wax Department; therefore, your position has been eliminated."

87. Mr. Corio and Mr. Alberto never offered, never discussed, never mentioned any job(s) that were admittedly available to Plaintiff prior to terminating her employment.

*Additional Post Termination Discrimination*

88. After having been fired on May 1, 2019, and having exhausted almost all unemployment benefits, Plaintiff learned that Defendants provided the DLT with false information and appealed the grant of her unemployment benefits resulting in additional

emotional distress over the possibility of Plaintiff having to pay back her unemployment benefits.

### *Gender/Sex/Pregnancy Discrimination*

89. The circumstances of Plaintiff's termination clearly establish a *prima facie* case of gender/sex and pregnancy discrimination under applicable law insofar as Plaintiff was in the protected class, Plaintiff's work performance always more than met the Defendants' reasonable expectations, and Plaintiff suffered adverse employment actions including termination for pretextual reasons and replacement with an employee outside of protected class.

90. Pursuant to the RICRA, FEPA, and Title VII, including the Pregnancy Discrimination Act, Defendants were prohibited from discriminating against Plaintiff on the basis of her gender/sex and pregnancy.

91. The Pregnancy Discrimination Act ("PDA") codified under Title VII expressly provides that gender discrimination applies to discrimination on the basis of pregnancy, 42 U.S.C.§2000e(k), as does FEPA, R.I. Gen. Laws §§28-5-7(1)(i) and (ii) and 28-5-6(2)("[B]ecause of sex" or "on the basis of sex" includes, but is not limited to "pregnancy, childbirth and other related medical conditions.").

92. The PDA provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

### *Refusal to Accommodate*

93. Further, pursuant to the FEPA, R.I. Gen Laws § 28-5-7.4 and Title VII, Defendants were prohibited from refusing to reasonably accommodate Plaintiff's then forthcoming request for medical leave relating to her pregnancy/childbirth and from denying Plaintiff's employment opportunities based on its refusal to provide reasonable accommodation.

94. Nevertheless, Defendants forced Plaintiff to accept accommodation that were never needed or requested thereby causing her to suffer adverse employment actions such as loss of overtime, cut in hours, reduction of pay, transfer of job positions and ultimately terminating on the basis of her pregnancy which denied her employment, in whole or in part, on that basis.

95. Upon information and belief, Defendants were aware that Plaintiff had a need or would likely have a need for a reasonable accommodation due to her pregnancy and/or disability in the form of intermittent leave for medical appointments and/or occasional pregnancy related inability to work.

96. In addition, Defendants' failure or refusal to engage in a dialogue relative to the necessity and nature of any reasonable accommodation Plaintiff could have required, in and of itself, instead of transferring and ultimately terminating her, qualifies as prohibited discrimination.

*Pretext and Discriminatory Intent*

97. The patently false and fabricated attempt to justify Plaintiff's termination, i.e., that Plaintiff needed a transfer due to fear of chemicals and that there was no work available for Plaintiff, is nothing more than pretext to terminate Plaintiff because of her gender/sex and pregnancy and/or for need for leave, which supports an inference of discriminatory intent.

98. That Defendants discriminated against Plaintiff because she was pregnant is further supposed by the undisputed fact that Plaintiff's transfer to the Wax Department was because of Plaintiff's gender/sex and pregnancy.

99. Defendants aided, abetted, incited, compelled, or coerced Plaintiff's unlawful discrimination and termination on the basis of her gender/sex and pregnancy in violation of the RICRA, FEPA, and Title VII as alleged herein.

100. Defendant Corio obstructed or prevented Defendants from complying with the provisions of the RICRA, FEPA, and Title VII as alleged herein.

101. Defendants attempted, directly or indirectly, to violate the RICRA, FEPA, and Title VII as alleged herein.

*Motivation and Harm*

102. Adverse employment action based in whole or even in part on account of gender/sex and/or pregnancy constitutes prohibited discrimination.

103. Defendants' wrongful and/or unlawful acts and/or omissions, including, but not limited to those described herein, are in violation of the RICRA, FEPA, and Title VII and were motivated by malice or ill will toward Plaintiff, and Defendants otherwise acted in bad faith and/or with reckless indifference to the statutorily protected rights of Plaintiff.

104. As a proximate result of Defendants' wrongful and/or unlawful discriminatory acts and/or omissions, including, but not limited to those described herein, Plaintiff suffered, is now suffering, and will continue to suffer emotional and economic injury, including, but not limited to, pecuniary losses, loss of income, loss of benefits, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, damage to her professional and personal reputation, and has incurred and will continue to incur expenses for legal services, and other great harm.

105. Indeed, Plaintiff's due date was June 1, 2019, but Plaintiff went into early labor on May 10, 2019 due to the stress and ultimately had to have an unanticipated c-section.

### VII. Claims for Relief

106. Plaintiff incorporates the allegations in ¶¶1 through 105 above in each of the counts set forth below.

### Count One
### As to Corporate Defendants
*Title VII of the Civil Rights Act of 1964,*
*42 U.S.C. §2000e, et seq*

107. Corporate Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment discrimination on the basis of Plaintiff's sex/gender and/or pregnancy in violation of Title VII, and thereby deprived her of rights secured under Title VII, causing Plaintiff to suffer damages as aforesaid.

### Count Two
### As to Corporate Defendants
*Rhode Island Fair Employment Practices Act*
*R.I. Gen. Laws §28-5-1, et seq.*

108. Corporate Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment practices against Plaintiff on account of Plaintiff's sex/gender and/or pregnancy in violation of the FEPA, and thereby and otherwise deprived her of rights secured under the FEPA, causing her to suffer damages as aforesaid.

109. Corporates Defendants violated the FEPA, R.I. Gen. Laws § 28-5-7.4 (a)(4), by failing and/or refusing to provide Plaintiff with the mandatory RICHR Pregnancy Rights Notice form.

110. Corporate Defendants further violated the provisions the FEPA, R.I. Gen. Laws § 28-5-7.4 (a)(1) and 28-5-7.4 (a)(2) by refusing to reasonable accommodate Plaintiff's prospective conditions related to her pregnancy or childbirth and by denying her employment opportunities in violation of § 28-5-7.4 (a)(3).

<u>**Count Three**</u>
**As to All Defendants**
**Rhode Island Civil Rights Act of 1990,**
*R.I. Gen. Laws § 42-112-1, et seq.*

111. Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, engaged in unlawful employment discrimination on the basis of sex/gender and/or pregnancy in violation of the RICRA, which has caused Plaintiff to suffer damages as aforesaid, and for which Plaintiff is entitled to relief pursuant to R.I. Gen. Laws § 42-112-2.

**VIII.** <u>**Prayers for Relief**</u>

**WHEREFORE**, Plaintiff prays that this Honorable Court grant the following relief:

1. A declaratory judgment declaring that the acts and/or omissions of Defendants, including, but not limited to those complained of herein, are in violation of the RICRA, Title VII, and FEPA;

2. An injunction directing Defendants to take such affirmative action as is necessary to refrain from such conduct as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated;

3. An injunction or other equitable relief, including, but not limited to, an award of back pay, front pay or reinstatement, and other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct;

4. An award of compensatory damages;

5. An award of exemplary and/or punitive damages;

6. An award of prejudgment interest, reasonable attorneys' fees, and costs; and,

7. Such other and further relief as this Court deems just and proper.

## IX. Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## X. Designation of Trial Counsel

Plaintiff hereby designates Richard A. Sinapi, Esq. and Danilo A. Borgas, Esq., as trial counsel.

                                            Plaintiff,
                                            Licaira Feliz
                                            By her attorneys,
                                            **SINAPI LAW ASSOCIATES, LTD.**

**Dated: July 20, 2021**                    /s/ **Danilo Borgas**
                                            **Danilo A. Borgas, Esq. (#9403)**
                                            **Richard A. Sinapi, Esq. (#2977)**
                                            2374 Post Road Suite 201
                                            Warwick, RI 02886
                                            Phone: (401) 739-9690
                                            FAX: (401) 739-9490
                                            Email: dab@sinapilaw.com
                                                        ras@sinapilaw.com